The first case for argument this morning is 18-1658, iCeutica v. Lupin. Mr. Richards, good morning. Good morning, Your Honors, and may it please the Court. Oliver Richards for appellants. And unless the Court has questions otherwise, I'd like to focus this morning on amendment based estoppel. And on that question, we basically have two questions we have to answer. First, does the prosecution history evidence an objective intent behind the amendments made? And if so, what is that intent? And second, we have to analyze whether that intent is directly relevant to the equivalent at issue here. Well, there's an interesting discussion of policy back and forth on this case, and this is kind of an unusual case. But with the backdrop of knowing that there's a real strong no dysfunction in patent rules, even if we credit everything you say about why the patent owner in this circumstance, what his motivations were, her motivations, if you choose with specific language changes to expressly claim a range in furtherance of that motivation, why does the fact that the motivation may have been a little different or not directly related get you a pass on DOE? Well, I think that when we're considering this public notice function, we have to consider who is being noticed. So here, this is a drug patent. It's supposed to provide notice to competitors, and we have to kind of consider here that we've got sophisticated competitors. This is not Joe off the street looking at this patent saying I need to make some Naloxone. And as this Court said in Intervet, we have to fully consider the record. It can't just be plucking statements out of the prosecution history. We've got to consider the prior art. It's very clear that you gave up less than $1,200, period. Well, as a matter of literal infringement, I agree that the claims were amended. Well, that's why you were stopped to recapture it. Well, I disagree that simply because we amended, we can't recapture any of that ground. I mean, if we look at what happened in Intervet, you know, there was an amendment in that case to recite of porcine stercovirus-2, right? And that, you know, the original scope of the claim would have included the accused product in that case, and the amendment took it out. But they were allowed to recapture some of that ground because both in Intervet and in institute form or whatever that case was, you know, you have to look at the rationale behind the amendment. That's what this case law says is we have to look at the rationale. The rationale was to avoid the reference. Yeah, but how would it avoid that reference? So like in, you know, the institute form case, right, there was an amendment added to say of one, to specify one suction cup, right? But the rationale wasn't necessarily to avoid prior art based on, you know, the one suction cup in that vacuum device. And I can provide some background, you know, if you all like. But the rationale was to distinguish prior art based on the source of the vacuum, all right? And just because the claim was amended in a way that read out as a matter of literal infringement, the particular equivalent doesn't mean they weren't able to recapture that ground. So on that, this question, you know, the prosecution history here, and I think the panel seems to be, you know, I'm sure is aware of it, seems to be replete with evidence that the rationale here was about the particle size distribution and not. But sometimes you choose even the rationale is to accomplish one thing. There are options you have in terms of choosing how to implement or achieve what your goal is. And if the patent owner chooses one of those options and it's quite clear from the language, what's at stake here? I mean, I see a distinction to be drawn between the cases you've cited and the one here. So how do we get by that here? The language is, there's no question the language is clear. So if you're on the receiving end, notwithstanding that, yeah, drug companies may be pretty sophisticated, and you're looking at the prosecution history, it just seems like an unreasonable amount of effort to require a future business holder to look at the motivation and then compare it to the claim language. Here, there were several stages of the amendment, right? Some amendments were rejected. And it just seems to me striking how much effort and speculation it will take on the receiving end to get to where you want to go. I mean, I disagree that there's much speculation required. I mean, we look here, I mean, there's a single prior art reference, right, which is Cooper. And Cooper expressly says particle size can range up to 2,000, right? And we look at, you know, it is, I will acknowledge that there is some complication that the examiner didn't seem to understand the argument we were making throughout the prosecution. And if you look at the record, the record, you know, says the examiner rejected because she said, okay, Cooper goes up to 2,000, you all are within 2,000. But then the final amendment didn't actually cure that objection, right? There's still an overlap between the range taught by Cooper and the final range. And so if you're a competitor and you're looking at this and you say, okay, I look at the Cooper, and that's not that challenging. It's right there on the first page of Cooper. It says up to 2,000, and the examiner cited it. We look at the final claims, and they still overlap. You know, I think at least a reasonable inquiry as to what's actually going on here is not that much to ask of a competitor here. You know, and, you know, again, particularly considering, you know, that this is a sophisticated company that, you know, that is investing time and money into, you know, development and formulation. It's challenging, right? I mean, claim construction by itself in the context of literal infringement is hard enough under Phillips and in light of the spec. And now we're at a level of granularity beneath that, right? I mean, it's interpreting the prosecution history and looking back and forth, and there's a lack of precision. And then, again, the bottom line is irrespective of your goal, you have choices on how to achieve that. So perhaps there was a way that you could have amended the claim narrowly to exclude Cooper and not to have gotten you to where you are. But this is a challenge, right? Yeah, I mean, I agree. I mean, I think that every litigator wishes they had a time machine and they could go back in time and rewrite claims later on, you know, and every prosecutor wishes they had a crystal ball to look into the future. But like the Supreme Court said in Festo is that we, you know, there's no reason, you know, we don't expect prosecutors to be prescient. That's the whole reason behind the doctrine of equivalence. And, you know, another thing to remember here is that, you know, just all we're asking for is an opportunity to try this case. There's a reason why there are trials, right? Even with claim construction, you've got that stage. There's a whole judicial process. And, you know, that's why the ANDA process exists, you know, is that they can test claims beforehand and, you know, declaratory judgment is – there's a whole process that exists here. And I think that – But the jury plays no role. I mean, you agree this is an issue of law – a question of law, that the jury is not going to be making assessments of whether this was tangential or not or so forth, right? Correct. But just because we get to try the case doesn't mean that there's equivalence. There still has to be later on a determination as to whether it is or is not equivalent, right? And that is the function when we self-test? Yes, correct. Okay, so now in reading through Lupin's briefs, Lupin seems to suggest this broad, narrow thing is litigation-inspired. I mean, all we're doing – I mean, to your question from earlier, I mean, this is – if all we do is read the examiner's reasons for allowance, you know, you just have to really even, as a competitor, read that. You know, the examiner lays it out very clearly. She says, look, Cooper teaches up to 2,000, but Cooper teaches a narrow range. These claims are different because they teach a broad range. We're not just making this up, you know, later on. This is what the examiner's words actually said, you know, in Appendix 258. The examiner said it. The examiner said it again in allowing the 734 in Appendix 625, you know, and even in the examiner's statement of the interview, this appears all throughout the prosecution. It's the 627, you know, that the district court focused on. She said this amendment still, you know, demonstrate the broad particle size range. And so to your point, I don't think it's that – I mean, it's all throughout the prosecution history. There's – I mean, certainly, you know, some statements that, you know, are challenging, but this is not – you don't have to look that hard to find the rationale here. So let's go ahead and we can go ahead and turn to, I guess, directly relevant if the court wishes or if you all have additional questions on the record, we can obviously address those. But so let's turn to the second question here is, is the objective rationale directly relevant to the equivalent at issue? And so on that, we actually have to look at the equivalent at issue here. And Lupin's product uses a broad distribution range like the patents. So if we look to, you know, they didn't specify D50 in the ANDA, and I'll cite to the district court's public order so it's not revealed confidential, but just look at the Appendix 28, you know, the D50 that they've – that some of the test data shows. The D50 is around 200 nanometers. The D90 is less than 800 nanometers. And certainly – Well, look, Lupin's 90 percent data was 800, right? So that's their target, correct, sir. And that's directly relevant to the retreat giving away 0 to 1,200. I think that the question we have to ask is, is it directly relevant to the rationale behind the amendment, right? And I don't think that the equivalent at issue here is 200, 800, is directly relevant to the rationale, which was to avoid a very narrow distribution taught by Cooper, right? So in Cooper, you know, we have to remember, like, if we look at Cooper's actual data, I mean, Cooper instructs us, consistent with the common knowledge at the time, is that you wanted to have a narrow spread of very small particles, right, because the concern was about, like, osmotic ripening, you know, these things growing and potentially being harmful or not being absorbed. So that's – and what Cooper shows, their data shows, is that the difference between D50 and D90 was always less than 100 nanometers. And if we look at, you know, the patents here, they defied that common knowledge. You know, we've got a very broad spectrum. So this court has certainly said that whether the equivalent at issue is within the prior art is not necessarily the answer to the question, but it's certainly a relevant inquiry here. And if we look at the prior art and Lupin's, you know, and the product compared to the patents, they're certainly a lot closer to us than they are to – they're not within the prior art, certainly, and they're a lot closer – you know, they have this broader particle size range. And you would have to prevail on both the amendment estoppel issue and the argument estoppel issue in order to prevail here? Yeah, that's correct. Either one would preclude us from asserting doctrinal equivalence. You want to save your – you're in your rebuttal times. Yeah, let's go ahead and save the rest. Thank you. Thank you. Good morning. Good morning, Your Honor. May it please the Court. Bill Zimmerman on behalf of Lupin. The district court correctly held, as a matter of law, that argument-based estoppel and amendment-based estoppel separately and independently preclude application of the doctrine of equivalence. I'd like to turn first to the – But what about his argument about how there was – there's little dispute as to what their motivation was and what they were trying to achieve, which is to avoid Cooper. They were trying to avoid Cooper, but I'd like to directly address the rationale that they claim that they were focused on the difference between D50 and D90, the size of the particle limitation. But if you look at the prosecution history, that's not what happened. If you look at Joint Appendix page 183, this is where the D90 limitation is first introduced into the independent claims, and it's during prosecution of the 318 patent. They introduced the lower limit of 900, but there is no D50 limitation. They're not arguing the difference between D90 and D50. It's D90 alone. And then if you turn to page 190 – But the avoidance of Cooper was imperfect, though, wasn't it? Because Cooper said less than 1,200. It may have been imperfect, but we have to look for the rationale of the amendment, not the rationale on which the patent may have ultimately been allowed. At the time of the amendment, if we look at page 190, what did they argue to the patent office? They told the patent office that the D90 of Cooper is 300, and the D90 of their claims was 900. The sole argument for patentability that they made over Cooper at the time of the amendment was a difference in D90. This broad particle size distribution that they're alleging now doesn't come until way later in the prosecution history. When they make the subsequent amendments to 1,200 at page 241 of the appendix, they make the same argument. They focus solely on D90, no argument about broad versus narrow particle size distribution. It's only that the difference in their claims in D90 is allegedly different from Cooper. So the rationale for the amendment was to distinguish Cooper based solely on the D90 limitation. They do it again at page 606 and 607 of the joint appendix. So throughout the prosecution history, they tried to distinguish Cooper solely on the basis of D90, and so that was the rationale for the amendments. Now, those amendments sequentially didn't work, and they ultimately have to make other amendments, but we look at it on a limitation-by-limitation basis, and the D90 limitation was expressly added to distinguish Cooper based on D90 alone. Even when the examiner allows the claims, though, the examiner doesn't say, oh, it's a broad particle size distribution. If you look at page 625 of the joint appendix, the examiner is very clear that it's not any broad distribution. It's a broad distribution where they fall within these specific ranges, and the examiner three times refers to the specific D90 particle size limitations. And so any objective reading of the prosecution history is that the D90 limitation, that lower limit of 1,200, first 900, then 1,200, was made in an effort to overcome Cooper. It's directly relevant to the Lupin product, which has a much lower D90 value. Turning to argument-based estoppel, it's not just that they made the amendment. On pages 190, 241, and 606 of the joint appendix, they specifically say it's a minimum, and they argue that it's a minimum, and that minimum distinguishes Cooper. So you can't represent to the public throughout the prosecution history that the lower 1,200 value is a minimum and then say during litigation that representation doesn't apply. Well, your friend's, a bit of his answer is that we're not really looking at representation to the public, that we're looking at Lupin, which is a sophisticated flavor in the market with an understanding of particle size and distribution and all this stuff. Is that right in your view? I believe you look at an objective standard, and what would a person of skill in the art view the prosecution history as reading? So it would be a skilled artisan in the pharmaceutical art. And unlike the policy of most doctrine equivalence cases where you have vagaries of language and you may not be able to capture your invention, that's not the case when you're dealing with numbers. The numbers are express. 900 is always less than 1,200, and the value that was picked in the Lupin product, 800, is always below what they seeded. There wasn't some ambiguity in the range they picked. They now just don't like the range they picked because objectively reading it, someone was able to design around the patent. And when you make a clear representation as to what your minimum is, the public should then be free to design around in the area that was surrendered. Do none of the cases your friend relies on deal with the numbers, right? There is not, at least in our research, an express numerical range case that we were able to find. The closest case, and it's not cited in the brief, Your Honor, it just came out on May 31st, is the non-precedential opinion in Cobalt Boats v. Brunswick. And the statement there is, in particular, when claims are amended to include a specific numeric boundary, we have held that the patentee cannot later recapture what is beyond that boundary through the doctrine of equivalence. So there isn't a precedential case that we were able to find dealing directly with numerical ranges. Well, did that sentence end in a cite to a precedential case? Because it says, you read to me, it says, we have held, usually we would include a citation. It did. The case that was cited was Wang Laboratories,  But that case was the number of units, eight versus nine, it wasn't a numerical range case. So this would be the closest precedent in terms of a numerical range. There must be a little bit of wiggle room on the numerical range, right? I mean, if their patent said, and I don't know the science, so maybe this might have a big difference practically, but just bear with me on the hypothetical, if their patent said 1,200, and you designed around with 1,195, even though the specific range was 1,200, assuming that had no practical difference, then you might see the doctrine of equivalence come in, no? Then you would have a much harder case, and you can use words of approximation, and this claim doesn't, but even if we gave them that wiggle room, we're in a scenario where they amended to add the 900, the patent office said, you can't have 900, then they amend to 1,200, they certainly can't get back far enough to recapture 900, and Lupin's product is so far below that at 800 that the hypothetical, you might get some range of equivalence, but that's not the scenario we're dealing with here. So the district court correctly found both argument-based and amendment-based estoppel, and respectfully, we would ask the court to affirm. Does the panel have any further questions? Then I will cede my time. Thank you. So I just want to pick up where opposing counsel left off, which is the numerical range. I just want to point out in InterVet, I think it is pretty analogous, and there was a numerical range in that case, because in that case there was a dispute as to what PCV2, but the patent itself said that PCV2 was defined by 95% similarity to these five strains they had deposited with the patent office, and roughly 73% homogeneous with the previous PCV1. So there was a numerical range in that case as to how similar the strains had to be. Just briefly, I also want to kind of address a general theme that I've seen come through, which is the idea behind the effect of the amendment versus the purpose behind the amendment. So if you look at the effect of the amendment here, obviously is to recite a particular range for T90, and the effect of the amendment, what actually was done can be evidence, I certainly agree it can be evidence of the intent, but what we have to look at here is the intent, not necessarily the effect. Because if the effect is automatically the intent behind it, there would be no point to being able to rebut the presumption of doctrinal equivalence. It would collapse down, because if you just look at the amendment made, and you say, okay, you gave up between 900 and 1200 per se, and you could never recapture that, the whole analysis would be, is there a presumption, because there was an amendment, and then yes, but there's... Why wouldn't what's left over for equivalence be what I just discussed with your friend, something not quite 1200, but essentially equivalent to it, like 1150, or even 1100? Whereas, which, you know, you specifically gave up 900, and they're at 8. It seems to me that that's kind of a hard line, once you specifically, you know, whatever reason you gave it up for, you gave it up. Well, I mean, how much that wiggle room would be would depend on the specifics of the case, the technology. You know, these are all factual issues that I think would be appropriate for a determination of whether their product is or is not equivalent, but as a matter of judicial, I mean, where would you draw the line? You know, 1195, 1150, 1100? I mean, so... Well, I would think you would at least draw the line at you tried to get a certain amount, 900, and they said no, and you went up to 12. And so it at least has to be anything below 900 can't be equivalence, and then we can talk about between 9 and 12. Well, I mean, so that again is... I mean, if we look at subsequent amendments here, the original claims did not specify a D-90 range, so we're going from nothing to 9 to 12, but if we look at 9 to 12, that is the ground ceded by that particular amendment. The law says there is a presumption of estoppel for that ground that we gave up. We have to be able to at least have an opportunity to rebut that presumption, but just simply because we went from 9 to 12 doesn't mean we automatically lose everything between 9 to 12. We're not talking about 9 to 12. We're talking about 8, aren't we? We're talking about... yeah. I mean, maybe you didn't give up everything between 9 to 12, and you might have had a stronger equivalency argument there. And isn't it 0 to 12? I mean, there was nothing recited. It's, I guess, everything to 12 or 0 to 12, depending on how you want to think about it, but yes, there was certainly something to 9 to 12, correct. But again, that's the effect of the amendments. The law says we have to look at the rationale behind why those amendments were made, which is not the same thing as the effect. Your time has expired, so if you have a final thought, we'll take it. No, I will rest, and thank you all very much. Thank you. We thank both sides, and the case is submitted.